MEMORANDUM OF DECISION
On April 22, 1999, the Department of Children and Families, hereafter "DCF", filed a petition to terminate the parental rights of Jacqueline D.C. and William T. to their daughter, Julie Lee C., now four years old. On October 1, 1999, Jacqueline D.C. consented to the termination of her parental rights. The court found her consent to be knowingly and voluntarily made with the assistance of competent counsel and the court accepted her consent. The petition was amended to reflect her consent. Trial of the termination petition against William T. took place on November 23, 1999. For the reasons stated below, the court grants the termination petition. From the evidence presented, the court finds the following facts:
 A. FACTS 1. Procedural Background, Family History and William T., thefather.
Julia Lee was born on July 11, 1995 and was the first child born to her mother and, as far as is known, to her father. Both parents are hearing-impaired and at the time of Julia's birth, her father was incarcerated in connection with sexual assault and burglary convictions. Petitioner's Exhibit 3 sets forth the father's extensive arrest record. It reveals that William T. was CT Page 15781 arrested in 1981 for robbery, sexual assault 1, and assault 1. He was convicted in May, 1983 and sentenced to 20 years incarceration. He was released on probation in 1993. His probation officer testified that in 1994, William was again arrested. As a result, his probation officer applied for violation of William's probation. The new arrests were for almost identical charges: sexual assault 1, sexual assault 3 and buglary. William T. received, on the original 1982 convictions, the balance of his sentence for a total of forty years. He remains incarcerated at present and his earliest release date is 2009 and his expected release date is 2015. He is not available to parent this child, as he himself admitted in his court testimony.
On July 17, 1995, DCF invoked a ninety-six hour hold on Julia Lee, after hospital staff had contacted them to relay their belief that her mother, Jacqueline, was not able to care for this infant. Jacqueline is profoundly deaf, has mild cerebral palsy and is mentally retarded. DCF sought and obtained an order of temporary custody and Julia was placed in 1995 with the foster family with whom she continues to reside. Julia Lee was adjudicated an uncared-for child on May 14, 1996 and was committed to the custody and care of DCF, which commitment has been extended on three occasions since that time.
Heroic efforts were then made to reunify Jacqueline with her daughter, which efforts ultimately failed. Court expectations and treatment plans were also established for William T., even though DCF did not expect to place the child with him, because of his long period of incarceration. Those efforts began when Julia Lee was sixteen months old with monthly visitation between Julia Lee and her father in prison in September, 1996 and terminating in June, 1997. The first two visits, according to the testimony of the DCF social worker, went well but by the third visit, Julia began to cry and each visit after that time was traumatic, with the child crying throughout the visits and having tantrums prior to attending. William T., according to observation during the visitation sessions, interacted only marginally with his daughter.
On August 12, 1997, the court granted a motion to terminate visitation (Teller, J.), concluding that visitation was not in the child's best interest. A further motion for visitation was denied in 1999. (Keller, J.) In addition, the court, on May 13, 1997 and June 9, 1998, found that reasonable efforts had been CT Page 15782 made to reunify the family. On June 9, 1998, the court found that further reunification efforts were no longer appropriate.
Little is known about William T.'s family history, as he has been unwilling to supply any information to DCF. He is now thirty-five years old and has been incarcerated for most of his adult life since 1982. His past behavior is one of criminal violence towards others. His probation officer testified that he is classified as a high-risk offender. The DCF social worker testified that she felt threatened by him and that during the course of her involvement in the case, she only had two contacts with him. During a telephone conversation with her, he asked for pictures of his daughter, but did not inquire about how Julia Lee was doing in daycare or school. The social worker testified that DCF expected William to take advantage of whatever programs were available to him through the Department of Corrections, but that William refused to sign releases so that DCF could check on whether or not he had completed any programs.
William testified on his own behalf at trial. He stated that there was an anger management program available to him in the facility in which he was incarcerated. He did not believe that there was a parenting program available. He testified that he refused to take any programs while incarcerated because the prison system violated his Americans with Disabilities Act rights. It did not provide him with an interpreter to enable him to participate, he stated. In much of his testimony, he appeared angry and upset, but most of all when speaking about this stated violation of his rights.
Upon cross-examination, he admitted that he wears a hearing aid and has very limited hearing. It was apparent that he was able to speak and could be understood by the court, although with difficulty. His testimony, however, was with the assistance of hearing interpreters, who signed to him and to whom he signed in return. Nonetheless, the court concludes that he had a limited ability to participate in programs while incarcerated and that he himself neglected to take advantage of such opportunities as were available to him. When faced with a choice between trying to take steps to enable him to understand how to communicate and manage his anger so that he could communicate with his child and pursuing a claim based on the Americans with Disabilities Act, William T. chose the latter.
William is also able to read and write, claiming that he CT Page 15783 taught himself and that he attended school through the ninth grade. Among the letters he wrote to his daughter was one with a small pictogram in it, which DCF interpreted to be a gang sign. William testified that it is the sign for "I love you" and he demonstrated the hand sign used by signing hearing-impaired people. A copy of the letter was admitted into evidence. The letter is dated January 13, 1997. In the body of the letter, William writes: "I brought you in the world and I will take you out." Upon cross-examination, William's explanation for this ominous sentence in the letter is that it something he heard in a film and that it is a joke. The court, given all of William's testimony as well as his past criminal conduct, cannot credit his explanation of the threatening sentence and takes it to mean what it appears to say.
Whether or not the sentence was meant as a joke, the entire letter is inappropriate. Julia Lee was, at the time the letter was written, not yet two years old. The letter fails to take her age and maturity into account and is not something that could be read to or shared with any child of this age. It appears to be addressed to an adult or perhaps a ten-year old child, but certainly not a toddler. It is evidence of William's lack of understanding of child development and his daughter's age and needs.
William T. testified that he is this child's biological father and family. This, to him, overrides, any awareness that her whole childhood must be spent in the care of others, other than her biological family. When asked to describe the relationship he had with his daughter, William T. stated "I am her father and I love her." He excused the failed visitation as a result of the things the "other family" made Julia do. He appeared to have no understanding or appreciation for the rigors that the conditions of a prison visit would impose upon a toddler. In short, the court finds that he had no understanding of Julia's needs to be nurtured by a permanent family of her own.
2. Julia Lee C., the child.
Julia Lee, since a few days after her birth, has been with the same foster family. She is bonded to them and regards them as her family. She is a bright, friendly, outgoing and very determined child. The social worker described her as a child who "loves to play and can tend to be sassy and bossy as she is a willful child who is quick not only to assert herself, but also CT Page 15784 to advocate for her own needs and desires."[2] Julia Lee has met all developmental milestones and her foster parents are prepared to adopt her. In fact, it is apparent that they are willing to do whatever is necessary in the best interests of the child as they were willing to have Julia's mother come to live with them, so that they could assist her with parenting this child. There are other children in the home who are close to Julia and she to them. Julia has no positive memories of her father and efforts to reunify her with her mother only made the child more determined to retain her primary bond with her foster parents.
 B. ADJUDICATION 1. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, . . . . provided that such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes §17a-112 (c)(1). As previously indicated, the court previously made this finding for both parents on June 9, 1998. The court also concludes, from the clear and convincing evidence and from the earlier court findings, that DCF made reasonable reunification efforts.
2. Adjudicatory Findings
In the petition, DCF alleges that the child was previously adjudicated neglected and that the father has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, he could assume a responsible position in the life of the child. The remaining allegation is that there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
"`Personal rehabilitation as used in the statute refers to CT Page 15785 the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M. 6 Conn. App. 194,203, 504 A.2d 532 (1986). See also: In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984). Based on clear and convincing evidence, the court concludes that William T. has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of his child, he could assume a responsible position in Julia's life. Even though incarcerated, he has failed to take those limited steps available to him to understand himself better and to be able to communicate with his daughter. Connecticut General Statutes § 17a-112 (c)(3)(B).
The court has held this statute "requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further that such rehabilitation must be foreseeable within a reasonable time." Inre Felicia D., 35 Conn. App. 490, 500, 646 A.2d 862 (1994). Given that Julia requires permanency now and that William T. is not now nor will within the foreseeable future be able to provide such permanency, the two-prong test has not been met. Even if William were at liberty to care for Julia, he has made no effort to acquire the skills necessary to parent her or indeed any child.
Incarceration alone is not cause for termination of parental rights, In re Juvenile Appeal (Docket No. 10155), 187 Conn. 431,443, 446 A.2d 808 (1982). But as stated in the case of In reJuvenile Appeal (84-6), 2 Conn. App. 705, 711, 483 A.2d 1101
(1984): "Here there is more." William T.'s present incarceration follows from his voluntary illegal acts. His second series of arrests demonstrate he failed to learn from his ten-year period of incarceration which ended just prior to Julia's conception. His long record of repeated violent criminal behavior as well his failure to take any rehabilitative steps underscores his unsuitability to care for his daughter. When the court considers the age of the child and the length of time before this father could be released, the conclusion is inescapable that the statutory criteria have been met by the clear and convincing evidence. Even William T. does not claim he can be available to the child, but argues a different dispositional plan for the child than DCF offered.
The second ground alleged is that William T. has an ongoing parent-child relationship with Julia. The DCF social worker CT Page 15786 testified that Julia never spoke of her father anymore and when she had spoken of him earlier; her memories were negative. The cases have held that:
 "It is reasonable to read the language of `no on-going parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been displaced. In either case, the ultimate question is whether the child has no present memories or feelings for the parent." In re Juvenile Appeal (Anonymous), 177 Conn. 648, 670, 420 A.2d 875 (1979).
Julia has no present memories or feelings for her biological father. The court concludes, by the clear and convincing evidence that there is no ongoing parent-child relationship. The court further concludes, by the clear and convincing evidence, that to permit more time to pass for the establishment of such a relationship is detrimental to Julia, who requires permanency now.
 C. REQUIRED FINDINGS
The court makes the following factual findings as to William T., based upon the clear and convincing evidence required by Connecticut General Statutes § 17a-112 (e):
1) As previously found, appropriate and timely services were provided by DCF, including casework services, visitation, and numerous services to the mother. Visitation was made available to the incarcerated father until such time as the court ordered it terminated as not in Julia's best interests.
2) As noted above, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible, prior to the court determination that farther efforts were no longer appropriate.
3) DCF set reasonable and realistic goals as evidenced by the court-ordered expectations for both parents in order to reunify the family. Neither parent was able to comply with the expectations set for them and the father was unable to CT Page 15787 rehabilitate himself.
4) The feelings and emotional ties of the child with respect to the parents, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. Julia does not relate to her biological parents. Her psychological parents are her foster parents, with whom she has resided all her life. She has prospered there.
5) Finding regarding the age of the child. Julia is four years and four months old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return the child to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. William T. has done nothing to adjust his circumstances. The repeated voluntary criminal acts which led to his incarceration make it not in the best interests of this child to return her to his home, even if his expected release date were in the near future.
7) Finding regarding the prevention of the parents from having a meaningful relationship with their child. The court notes that DCF made reasonable efforts to reunify both parents with Julia, insofar as the circumstances permitted.
 D. DISPOSITION
Julia Lee has been in foster care for more than half of her life. Her mother has voluntarily consented to the termination of her parental rights. Her father will not be in a position to care for her during her minority, due to his incarceration. He argues that DCF should have considered his relatives as placement resources for the child. Indeed, his sister testified at trial. The court concludes from that testimony that neither she, nor William's mother, made any concerted effort to become placement resources; they did not seek visitation, they did not pursue any motions to intervene or other legal avenues to establish and maintain contact with Julia. What efforts they now claim to have CT Page 15788 made are too little and too late in Julia's life. Four years is a long time — Julia's entire life — to not know or have any relationship with biological kin.
Julia Lee is bonded to her present caretakers and has done well in their home. She is close to the other children in the home. She requires permanency to achieve a productive, healthy and happy future. Despite the importance of the biological familial bond that William T. claims, the failure to his collateral relatives to take steps to achieve contact with Julia cannot be placed at DCF's doorstep. He and they had that obligation from the date of Julia's birth. The court notes that:
 "But, ultimately, adults who bring a child into this world owe that child a huge responsibility, regardless of how indifferent DCF may seem." In re Elizabeth Joy, Superior Court, Docket No. H14-CP95-000491 A, Child Protection Session, October 15, 1998. (Shuman, J.) (Internal citations omitted.)
In Julia's life, her father and her biological relatives failed in that responsibility. The court is painfully aware of the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD),189 Conn. 276, 455 A.2d 1313 (1983). The Appellate Court has noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." Inre Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992.)
Based upon the foregoing findings, the court finds by the clear and convincing evidence that it is in the best interests of Julia Lee that the rights of her biological parents be terminated. The court orders that a termination of parental rights enter with respect to Jacqueline D.C. and William T. The Commissioner of the Department of Children and Families is hereby appointed Julia's statutory parent. Given the support her foster parents have provided Julia and the interest that they have in adopting this child, the court directs that they be given first consideration to adopt Julia. The court further orders that a permanency plan for Julia be submitted within sixty days. A review plan for her shall be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session CT Page 15789